UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ADAM CHARLES CARR, | CASE NO. 4:20-CV-02736-JG |
| Plaintiff, | JUDGE JAMES GWIN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Adam Charles Carr filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB") and supplemental security income ("SSI"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On December 9, 2020, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 26, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

## PROCEDURAL BACKGROUND

Mr. Carr filed for DIB on May 5, 2018 and SSI on May 6, 2018, alleging a disability onset date of August 25, 2017. (Tr. 116, 117, 245). His claims were denied initially and on

reconsideration. (Tr. 90-115, 118-149). He then requested a hearing before an Administrative Law

Judge. (Tr. 176). Mr. Carr (represented by counsel), and a vocational expert ("VE") testified at a

hearing before the ALJ on October 29, 2019. (Tr. 33-89). On January 14, 2020, the ALJ issued a

written decision finding Mr. Carr not disabled. (Tr. 12-32). The Appeals Council denied Mr.

Carr's request for review, making the hearing decision the final decision of the Commissioner. (Tr.

1-6; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Carr timely filed this action

on December 8, 2020. (ECF #1).

FACTUAL BACKGROUND[1]

I.     ADMINISTRATIVE HEARING

The following summarizes the pertinent testimony of Mr. Carr and VE Kim Foster

presented during the hearing before the ALJ.

Before Mr. Carr testified, his counsel gave an opening statement identifying Mr. Carr's

mental health impairments as bipolar disorder, depression, anxiety, PTSD, and intermittent

explosive disorder.[2] (Tr. 37). Mr. Carr treats with a psychiatrist. (*See, e.g.,* Tr. 55). He had seen a

therapist a few times and had an upcoming appointment scheduled in December 2019. (Tr. 70).

---

[1]     Mr. Carr argues the ALJ erred in evaluating the medical opinion evidence and
subjective statements, particularly as they relate to Mr. Carr's mental health impairments. Mr. Carr's
Brief on the Merits limits the relevant medical evidence to those impairments. (Pl.'s Br., ECF #12
at PageID 1015 n.5). Accordingly, I summarize only the evidence relevant to the claims Mr. Carr has
advanced. Mr. Carr waives argument on issues not raised in the opening brief. *Kennedy v. Comm'r of
Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

[2]     According to the DSM-V, the core feature of intermittent explosive disorder is failure
to control impulsive aggressive behavior in response to subjectively experienced provocation (*i.e.*,
psychosocial stressor) that would not typically result in an aggressive outburst, which is generally
impulsive and/or anger-based, and is associated with significant distress or impairment in
psychosocial function. Onset is most common in late childhood or adolescence. The course of the
disorder may be episodic, with recurrent periods of impulsive aggressive outbursts. Disorders most
commonly comorbid with intermittent explosive disorder include depression, anxiety, and substance

Mr. Carr left school before completing the 11th grade because he was always getting in trouble and making bad decisions. (Tr. 43-44). In response to the ALJ's question, Mr. Carr replied that he was in "some" regular classes in high school. (Tr. 44).

Mr. Carr lives with his mother and stepfather. (Tr. 39). They are trying to help Mr. Carr get his life on track by, for example, helping him get his medications. (Tr. 68). His mother was determined disabled due to bilateral hip replacements and back disorders. (Tr. 40-41). His stepfather is retired. (Tr. 40). Mr. Carr has never been married and does not have children. (*Id.*). Mr. Carr does some household chores, including taking out the trash and mowing the lawn. (*Id.*).

Despite having a driver's license, Mr. Carr does not drive because he "get[s] road rage very quickly," and does not want to get in trouble. (Tr. 42-43). Mr. Carr does not experience road rage as a passenger. (Tr. 43). His mother typically drives him to medical appointments. (Tr. 42). Once a week, he goes with his mother to the grocery store to help her shop, but they only go late at night, around 11:00 p.m. or midnight, to avoid other people. (*Id.*). Mr. Carr endorsed getting into fights with others at the grocery store. (Tr. 68). One such incident occurred about six or eight months before the hearing, when Mr. Carr verbally threatened two other customers in the cereal aisle who were in his way. (Tr. 69). This incident did not escalate to physical violence. (*Id.*). In response to the ALJ's question about whether his mother was okay with going to the grocery store so late at night, Mr. Carr responded, "Yeah. Because she needs me to go shopping, and she doesn't want me freaking out." (Tr. 70).

---

use. *See Disruptive, Impulse-Control, and Conduct Disorders*, Diagnostic & Statistical Manual of Mental Disorders, 5th ed. S2H15.

About twice a month, Mr. Carr walks to AA meetings held down the road from his house. (Tr. 55, 57, 67). Mr. Carr lives in a small town; consequently, only about four to six people attend the AA meetings. (55, 57). Mr. Carr used to live in Cleveland but moved in with his mother and stepfather because "drugs [were] too easy to get" in the city. (Tr. 64). Mr. Carr is currently sober; he stopped using crack cocaine and alcohol about two years prior to the hearing date, after starting mental health treatment with a psychiatrist. (Tr. 59). Mr. Carr used to turn to drugs when he became angry. (Tr. 59). Now, he "take[s] the pills, and [is] doing [his] best to just stay away from people and just stay around a few loved ones." (Tr. 60). Even so, Mr. Carr does not feel his medications are always effective. (Tr. 77). Anxiety is an everyday occurrence, and he has panic attacks when around strangers. (*Id.*). Mr. Carr does not attend AA meetings more often because he does not like being around people, and listening to others describe doing things he does not agree with brings out his rage. (Tr. 76). For example, Mr. Carr described wanting to beat up a meth addict who talked about robbing his own grandmother. (Tr. 76).

Mr. Carr endorsed spending time only with his mother and stepfather. (*Id.*, tr. 65). Even so, he testified that he just argues with them most of the time. (Tr. 68). He does not interact with the neighbors at all. (Tr. 67). He does not have a good relationship with his brother, who does not like the way Mr. Carr lives his life. (*Id.*).

The ALJ referred to an April 2018 treatment note when Mr. Carr told his provider he went to West Virginia for a week to help a family member. (Tr. 71-72). Mr. Carr explained he went to West Virginia to help his brother-in-law with some property. (Tr. 72). The trip amounted to Mr. Carr's brother-in-law drinking and complaining about his wife to Mr. Carr. (*Id.*).

4

Mr. Carr stopped working when he could no longer put up with customers and other employees. (Tr. 49-50). Mr. Carr explained he often quit his job suddenly because he would "freak out," call his employer to ask for his job back, and then quit again after a few months for the same reason. (Tr. 58). In addition, he testified to difficulty with focus and problems with reading comprehension; while he can read and understand a newspaper article, he is unable to understand the letters from the Social Security Administration. (Tr. 44, 57). Mr. Carr also explained that his depression often keeps him from being able to work; in a typical month half are good days and half are bad days. (Tr. 50, 53). On bad days, he keeps to his room and watches movies in bed. (Tr. 53). Even though his medication is sometimes helpful, he still has bad days. (*Id.*). On good days, Mr. Carr will come out of his room, chat with his parents, and do a few chores. (Tr. 60). He does not go out much. (*Id.*).

Mr. Carr testified that he has difficulty concentrating on the movies he watches because his "mind scatters." (Tr. 57). He explained that he is distracted by internal thoughts. (Tr. 54) ("I'll just start thinking – I'll be in the middle of a movie and be like, oh, the dishes are sitting in the sink."). His medications make him feel "spacy." (*Id.*).

The ALJ referenced an April 2019 treatment note stating that Mr. Carr was "feeling much better overall with treatment, not argumentative." (Tr. 55). Mr. Carr agreed that his prescribed treatment works at times, but not at other times. (*Id.*). The ALJ pointed out numerous treatment notes from his psychiatrist stating that treatment helped Mr. Carr without medication side effects and asked Mr. Carr to respond, to which he said he disagreed. (Tr. 61). Mr. Carr again explained that he had good days and bad days. (Tr. 62).

Mr. Carr concluded his dialogue with the ALJ by stating that he has been angry since he was five years old and "[i]t's exhausting waking up and being angry and mad every day." (Tr. 73-74).

The VE then testified. The ALJ asked if a hypothetical individual of Mr. Carr's age, education, and experience could perform his past relevant work if limited to light work except:

> can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; avoid concentrated exposure to hazards; can understand, remember, and carry out simple instructions, perform simple, routine, and repetitive tasks but not at production rate pace, such as an assembly line; adapt to routine changes in the work place that are infrequent and easily explained; interact occasionally with supervisors and coworkers and never with the general public; no working in teams or tandem.

(Tr. 83-84). According to the VE, such a hypothetical individual would not be able to perform Mr. Carr's past work, but could perform other light exertion unskilled jobs, including Mail Clerk (DOT 209.687-026), Sorter (DOT 361.687-014), and Tagger (DOT 229.587-018). (Tr. 84). If the hypothetical individual were limited to sedentary work, such an individual could work as a Sorter (DOT 521.687-086), a Final Assembler (DOT 713.687-018), and a Document Preparer (DOT 249.587-018).

The ALJ then asked if such a hypothetical individual restricted to light work could perform those same jobs if he was limited to rare interaction with supervisors and coworkers, where rare is defined as less then occasionally but more than never. (*Id.*). The VE stated such an additional limitation would be work preclusive. (Tr. 85). Even if the hypothetical individual were limited to sedentary work, the limitation to rare interaction would be work preclusive. (Tr. 85).

The VE testified that being absent two times per month would be work preclusive, as would being off task twenty percent of the workday. (*Id.*).

6

II.     PERSONAL AND VOCATIONAL EVIDENCE

Mr. Carr was 36 years old at the time of his alleged onset date, and 38 years old at the time of the administrative hearing. (Tr. 39, 90). Mr. Carr completed the tenth grade. (Tr. 43). In the past, Mr. Carr has been employed as a home restoration cleaner, a landscape laborer, an order picker, and a building maintenance laborer. (Tr. 83).

III.    RELEVANT MEDICAL EVIDENCE

On August 21, 2017, Mr. Carr went to the Emergency Department for psychiatric evaluation. (Tr. 373). He reported that he had "reached his breaking point" and endorsed anger, difficulty controlling his rage, and a history of violent behavior. (*Id.*, Tr. 375). Before then, Mr. Carr had not been diagnosed with a psychiatric issue. (*Id.*). During the assessment, Mr. Carr reported having a "horrible temper" and difficulty controlling his anger since age 12, and that he had been in "'250 bar fights.'" (Tr. 376). He claimed to get angry very easily in situations where people annoy him. (*Id.*). As an example: "He reportedly jumped a man in a [C]adillac 3 weeks ago because he annoyed him and beat him and kicked his car." (*Id.*).

At this appointment, Mr. Carr reported that he stopped drinking "cold turkey" six weeks before but continued to smoke 70 mg of marijuana a week. (*Id.*). Mr. Carr was described as irritable, angry, difficult to interrupt, and distractible. (Tr. 378). On mental status examination, Mr. Carr displayed inappropriate laughter, racing thoughts tangential to circumstantial associations, agitation, paranoid ideation, delusions of persecution, and grandiosity. (*Id.*). Mr. Carr was diagnosed with a mood disorder and was advised to engage with a psychiatrist. (Tr. 421).

On September 7, 2017, Mr. Carr was evaluated by psychiatrist Aileen Hernandez, M.D. (Tr. 506-12). He endorsed a history of violence beginning in the seventh grade and getting into

fights with friends, neighbors, and family. (Tr. 506). Mr. Carr also reported being fired from

numerous jobs because of his temper. (Tr. 508). Dr. Hernandez diagnosed Mr. Carr with PTSD,

intermittent explosive disorder, major depression, social anxiety disorder, generalized anxiety

disorder, and substance use disorders. (Tr. 511). She prescribed propranolol and Seroquel. (*Id.*).

Mr. Carr treated with Dr. Hernandez until June 2018. Throughout treatment, Dr.

Hernandez adjusted, added, and discontinued medications due to side effects or ineffectiveness.

(*See* Tr. 558). Mr. Carr typically presented as alert and cooperative, with appropriate thought

content and intact memory. (Tr. 462-64, 468-69, 484-86, 489-91, 496-97, 502-03, 559-60, 786-87,

800-01, 810-11, 825, 831).

Mr. Carr often reported continued problems with irritability or anger and a need to isolate

himself from others. In January 2018, Mr. Carr reported getting into an altercation with someone

at a gas station. (Tr. 482-83). He reported that he tries to stay out of public and in the house

because he feels safe from acting on his angry impulses. (Tr. 483). In February 2018, he reported

that his mood was "good" and that he was not having problems with anger as much. (Tr. 488-89).

In March 2018, Mr. Carr stated that the medications helped him with impulsivity; he was

able to stop and think. (Tr. 495). He claimed his depression and anxiety were still "terrible." (*Id.*).

In April 2018, Mr. Carr continued to complain of anxiety and depression, but felt his new

prescription for Wellbutrin was helping him feel less edgy. (Tr. 501). In June 2018, Mr. Carr

discussed a recent incident where he kicked a stranger's fender in a parking lot after Mr. Carr saw

the stranger backhand his girlfriend. (Tr. 558). Mr. Carr discussed moving to his mother's house

in Wakeman, Ohio. (*Id.*).

In August 2018, Mr. Carr began seeing Mary A. Peters, CNP. (Tr. 791). During the initial

evaluation, Mr. Carr explained he had been angry since he was a young child and noted a history

of violence. (*Id.*). He endorsed anxiety about being around strangers and in public places. (*Id.*). Mr.

Carr explained that he had been pervasively irritable, depressed, and angry. (*Id.*). He endorsed

agitation, isolating himself to avoid interacting with people because he cannot do so calmly. (Tr.

791). CNP Peters prescribed quetiapine. (Tr. 798).

On August 30, 2018, Mr. Carr met with CNP Peters for a medication follow up. (Tr. 785).

He endorsed mild improvement in mood with quetiapine though he remained pervasively

irritable. (Tr. 785-86). CNP Peters added lithium to his prescription regimen. (Tr. 788).

In September 2018, Mr. Carr continued to endorse pervasive irritability, racing thoughts,

distractibility, and being argumentative with family. (Tr. 804). He had not yet started taking

lithium. (Tr. 804). On October 3, 2018, Mr. Carr claimed his irritability was improving and that

he was less argumentative with his family members. (Tr. 799). He also felt the medication helped

control his impulsivity. (*Id.*). In November 2018, Mr. Carr reported that he stopped taking lithium

due to side effects. He reported improved mood ("not too bad") with less intense fluctuations and

reduced dysphoric outbreaks, clear thoughts, and improved impulsivity. (Tr. 809-10). CNP Peters

prescribed Lamictal. (Tr. 812). In December 2018, Mr. Carr endorsed tolerating his medications

well, and his pervasive irritability continued to improve. (Tr. 830). He endorsed no dysphoric

outbursts. (*Id.*).

In January 2019, Mr. Carr endorsed feeling angry all the time, but felt good at his

appointment. (Tr. 824, 825). He denied racing thoughts. (Tr. 824). Mr. Carr reported that his

dysphoric outbursts were limited and that he was able to remove himself from situations. (*Id.*). He

also explained that his anxiety waxed and waned. (*Id.*). CNP Peters tapered Mr. Carr off the Wellbutrin and prescribed Klonopin. (Tr. 827). In April 2019, Mr. Carr reported that his pervasive irritability was mild but that he had depressive symptoms for the past week and felt tired. (Tr. 903). He endorsed feeling better overall and reported that he was attending AA meetings. (*Id.*). In July 2019, Mr. Carr reported increased pervasive irritability for four weeks and explained he had not been taking one of his medications due to an error at the pharmacy. (Tr. 923).

## IV.   MEDICAL OPINIONS

State agency psychological consultants reviewed Mr. Carr's record at the initial and reconsideration levels. At the initial level, State agency consultant Karla Delcour concluded that Mr. Carr was moderately limited in his ability to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 98). She indicated that Mr. Carr is able to perform one- to three-step tasks in an environment with few changes, no strict quotas, and very limited personal interactions. (*Id.*). Regarding social interaction, Ms. Delcour determined Mr. Carr was moderately limited in his ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 99). She indicated Mr. Carr would be limited to occasional superficial interaction with others. (*Id.*). In relation to his ability to adapt, Ms. Delcour determined Mr. Carr was moderately limited in his ability to respond to changes in the work setting. (*Id.*). She concluded Mr. Carr can adapt to work settings in which duties are routine and predictable. (*Id.*).

The ALJ found this opinion "not very persuasive as the evidence supported greater restrictions." (Tr. 24).

On reconsideration, State agency psychological consultant Jennifer Swain, Psy.D., made similar findings except she determined Mr. Carr was markedly limited in his ability to interact appropriately with the general public, and moderately limited in his abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and travel to unfamiliar places or use public transportation. (Tr. 130). She concluded that Mr. Carr is not appropriate for work with the general public, he would be limited to occasional, superficial interactions with others in a smaller setting, would likely perform best in a more solitary setting and with no over-the-shoulder supervision, and can adapt to a setting in which duties are routine and predictable and travel to unfamiliar places is not a work requirement. (*Id.*).

The ALJ determined this opinion "was more persuasive as the evidence supported the claimant could do simple work as long as it was not at a production rate pace and changes were infrequent and easily explained in an effort to minimize stress." (Tr. 24). The ALJ additionally noted that while Mr. Carr "had difficulties around others," the medical record supported that "he was better able to manage his outbursts when on medication and staying away from drugs and alcohol." (*Id.*).

In September 2018, Dr. Hernandez completed a psychiatric impairment questionnaire on Mr. Carr's behalf. (Tr. 635-). She diagnosed Mr. Carr with PTSD, intermittent explosive disorder, major depression, and anxiety disorder. (Tr. 635). Dr. Hernandez cited psychosocial factors

11

including a history of childhood abuse and bullying, witness to violence as a child, and substance use. (*Id.*). She identified the following signs and symptoms supporting her diagnoses: depressed mood, anxiety, irritability, difficulty thinking or concentrating, intrusive recollections of traumatic experiences, vigilance and scanning, weight change, impulsive or damaging behavior, and insomnia and nightmares. (Tr. 636). Dr. Hernandez also noted Mr. Carr's explosive anger and his reported road rage with physical altercations. (Tr. 637). She opined Mr. Carr had a marked degree of limitation (defined in the questionnaire as constantly interfering with ability) in the following abilities: maintaining attention and concentration for extended periods, working in coordination with or near others without being distracted by them, interacting appropriately with the public, accepting instruction and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them. (Tr. 638). Dr. Hernandez also opined that Mr. Carr's mental impairments would cause him to be absent from work more than three times per month. (Tr. 639).

On November 11, 2019, Thomas M. Evans, Ph.D., performed a consultative psychological evaluation. (Tr. 938-42). This evaluation was based on a clinical interview with Mr. Carr and a medical record from April 2019 that Dr. Evans received from the State agency upon the agency's request for evaluation. (Tr. 938). During the interview, Mr. Carr reported getting along poorly with fellow coworkers, authority figures, and people in general. (Tr. 939). He affirmed getting fired from past jobs. (*Id.*). He expressed reticence returning to work for fear he will lose his temper and hurt someone or get in trouble. (*Id.*). Mr. Carr reported being able to drive, doing some of the household chores, and going shopping "at night." (*Id.*). On a typical day, Mr. Carr endorsed doing some household chores and watching television. (Tr. 940). Mr. Carr reported feeling depressed

and fatigued and being frequently irritable. (*Id.*). He also reported continued problems with severe

anger, but Lamictal helped "slow [him] down." (Tr. 941). He explained he is more anxious in

public and endorsed being beat up and bullied when he was younger. (Tr. 940). Because of Mr.

Carr's severe rage, Dr. Evans opined that Mr. Carr was markedly limited in his ability to interact

appropriately with supervisors, coworkers, and the public. (Tr. 936).

      In 2019, CNP Peters provided two letters stating that Mr. Carr was "unable to obtain

gainful employment" because of his underlying bipolar disorder. (Tr. 917, 933). The ALJ

determined these statements were not persuasive because they are on issues reserved for the

Commissioner. (Tr. 24). The ALJ again cited improvement ("less angry outbursts, less irritability,

he was calmer, he started to have the ability to remove himself from situations that angered him,

and he said he generally felt good") and noted these findings were not consistent with CNP

Peters's statements. (Tr. 25).

## V.   OTHER RELEVANT EVIDENCE

      In June 2018, Mr. Carr completed an Adult Function Report explaining how his

conditions limit his activities. (Tr. 293-300). In it, he emphasizes that he is quick to anger over

minor annoyances. (Tr. 296) ("Don't like society or friendly people talking to me. Stupidity makes

me angry."). He does not like being told what to do and becomes violent in the face of such

authority. (Tr. 298). When Mr. Carr is angry, he does not hear reason, will not follow instructions,

and resorts to verbal and physical altercations. (*Id.*, Tr. 299).

      Mr. Carr affirmed he has been fired from jobs because of problems getting along with

others. (Tr. 299). He offered several examples, including that he hit a work associate with a lamp,

punched his boss, and broke windows and other equipment while on the job. (*Id.*). As a final

comment, Mr. Carr offered: "I will kill someone someday as its [*sic*] worse every day. . . . Working associates are afraid of me and my anger. SO AM I." (Tr. 300).

## THE ALJ'S DECISION

The ALJ's decision, dated January 14, 2020, included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.  The claimant has not engaged in substantial gainful activity since August 25, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: bipolar I disorder; generalized anxiety disorder; intermittent explosive disorder; degenerative disc disease L3-L4 and L5-S1; and cocaine and alcohol use disorder, in remission. (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: can occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; avoid concentrated exposure to hazards; can understand, remember, and carryout simple instructions; perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact occasionally with supervisors and coworkers, and never with the general public; no working in teams or tandem.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on April 5, 1981 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 25, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 58-67).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh

the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up). An ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding." *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio 2013), citing *Goble v. Astrue*, 385 Fed. Appx. 588, 593 (7th Cir. 2010).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and

416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

17

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Carr assigns error to the ALJ's evaluation of the medical opinion evidence and subjective statements. (Pl.'s Br., ECF #12, PageID 1014). I discuss each of these in turn.

**Medical Opinion Evidence**

Mr. Carr asserts the ALJ did not properly evaluate the medical opinions in that the ALJ ignored extensive evidence relevant to supportability and consistency. (*Id.* at PageID 1026). In particular, Mr. Carr takes issue with the ALJ's evaluation of the opinions of Drs. Hernandez, Evans, and Swain. (*Id.* at PageID 1025, 1032).

Because Mr. Carr filed his application after March 27, 2017, his case is evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.920c. Under these regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b) and 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2) and 416.1513(a)(2).

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source

controlling weight. *Id.* at §§ 404.1520c(a) and 416.920c(a); *see also Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[3] and consistency.[4] 20 C.F.R. §§ 404.1520c(b) and 416.920c(b). An ALJ must explain how the ALJ considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3) and 416.920c(b)(2)-(3). In the decision, the ALJ is required to say enough to allow this Court to trace the path of reasoning in the decision. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011).

As noted above, Dr. Hernandez's opinion that Mr. Carr was markedly limited in his ability to maintain concentration and attention and to interact with others was grounded in the signs and symptoms Mr. Carr continued to display and report. Dr. Hernandez also considered Mr. Carr's reports of physical altercations with others. The ALJ determined Dr. Hernandez's opinion was not persuasive because the record showed improvement and Mr. Carr felt the medications were helping him. The ALJ pointed to Dr. Hernandez's treatment record from February 2018 noting that Mr. Carr's mood was "good," and that Mr. Carr felt he "doesn't have a problem with anger as much" after an increase in Neurontin. (Tr. 540). Another treatment record from Dr. Hernandez,

---

[3] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[4] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

dated March 2018, indicated Mr. Carr felt his medication helped him stop and think before he

acts. (Tr. 546). The ALJ also cited to an April 2018 treatment note wherein Mr. Carr stated that

since starting Wellbutrin he was not as edgy. (Tr. 552).

Upon review of the entire record, I conclude the ALJ erred in his evaluation of Dr.

Hernandez's medical opinion by failing to adequately articulate how he considered the

supportability and consistency factors, and by failing to build a logical bridge between the cited

evidence and his conclusion. The ALJ concluded Dr. Hernandez's opinion was unpersuasive

because her own records supported improvement. (Tr. 25). Dr. Hernandez's treatment notes

indicate that Mr. Carr endorsed some improvement, but the medical records also document

continued significant mental health symptoms and issues with medication effectiveness, such as

disturbed sleep, depression and anxiety still "terrible" (Tr. 495); anxiety and depression remain (Tr.

501); disturbed sleep, increase in Neurontin has not had any benefit with his anger, and Mr. Carr

discussed an incident where got into an altercation with a stranger in a parking lot, resulting in

Mr. Carr kicking the stranger's fender. (Tr. 558). The ALJ addressed none of this evidence.

I also note that "improvement" is dependent on the base level from which the

measurement is taken:

> Even if [a doctor's] use of the word "better" referred to Plaintiff's mood, this word
> did not provide the ALJ with substantial evidence from which to find that Plaintiff's
> mental impairment had subsided. The ALJ made no inquiry into the degree of
> improvement, or from what baseline Plaintiff had improved. Under the ALJ's logic,
> any improvement in one's mood, regardless of how small and from what level the
> individual improved, would defeat a claim of mental impairment. This cannot be so.

*Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011). Here, the ALJ

discounted Dr. Hernandez's opinion based on improvement but did not cite any findings or

evidence to show that the baseline from which Mr. Carr's condition had improved or the degree of

improvement such that Mr. Carr could engage in substantial gainful activity on a sustained basis. *See Riopelle v. Comm'r of Soc. Sec.*, No. 1:20-cv-266, 2021 WL 3721213, *11 (S.D. Ohio Aug. 22, 2021). The ALJ has not explained how some unknown degree of improvement in Mr. Carr's mood and impulsivity undercuts Dr. Hernandez's medical opinion. This is error.

The ALJ cites two examples purportedly showing Mr. Carr's "improvement" in symptoms that did not support the doctor's opined limitations: traveling to West Virginia for a week with his brother-in-law to work on some property, and going out to a restaurant with friends. (Tr. 21). The ALJ's mischaracterization of the events Mr. Carr attended placed him in a more capable light than is supported by the record. Indeed, Mr. Carr accompanied his brother-in-law to West Virginia, where the brother had recently purchased 26 acres of property. (Tr. 495). When discussing the trip with his psychiatrist, Mr. Carr stated that even though he would only be with one family member for miles around, he anticipated getting into arguments. (*Id.*).

The ALJ also noted Mr. Carr was able to go out to eat with friends. (Tr. 25). Mr. Carr told his psychiatrist that it was his first time in public since he quit drinking alcohol and using cocaine. (Tr. 552). He explained he did not want to go into the restaurant, but that his brother-in-law gave him a blue pill that was purportedly Xanax. (*Id.*). Mr. Carr told his psychiatrist that "he felt a little high" and "didn't give a shit about nothing." (*Id.*). Neither of these two situations, when placed in the appropriate context, show improvement in Mr. Carr's ability to interact with others or undermine the supportability or consistency of Dr. Hernandez's opinion. The record discloses that these two incidents are isolated, at best. "It is not enough for an ALJ to recite many 'details' from the records; rather, she must ensure that the evidence is considered fairly and in its entirety, rather than simply cherry-picking portions of the record that support the desired conclusion." *Hartman v.*

21

*Comm'r of Soc. Sec.*, No. CV 18-12887, 2019 WL 3424973, at *11 (E.D. Mich. July 2, 2019), *report and recommendation adopted*, 2019 WL 3412891 (E.D. Mich. July 29, 2019).

The ALJ found Dr. Evans's opinion "not very persuasive" because the record did not support that Mr. Carr had marked limitations in interacting with others. (Tr. 24). Again, the ALJ came to this conclusion because "when [Mr. Carr] was taking his medication" and "he was better able to control his anger/outbursts and his anxiety decreased." (*Id.*). Once more, the ALJ discounted Dr. Evans's medical opinion based on improvement but failed to explain how some unknown degree of improvement renders Dr. Evans's opinion unsupported or inconsistent with the record. This is error.

For these reasons, I recommend the Court remand this case for a re-evaluation of the medical opinion evidence that complies with the principles and standards described in this Report and Recommendation.

**Subjective Symptom Analysis**

Mr. Carr additionally argues the ALJ did not properly evaluate Mr. Carr's subjective statements in accordance with SSR 16-3p.

An ALJ follows a two-step process for evaluating an individual's symptoms. In step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and

aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief from pain or other symptoms; (6) any measures other than treatment an individual uses or used to relieve pain or other symptoms; and (7) any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms. *Id.* The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review.

23

*Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *See Ulman*, 693 F.3d at 713-14.

As described above, Mr. Carr testified he cannot work due to his anger issues caused by his mental health impairments. He also testified his medication's effectiveness waxes and wanes – he has good days and bad days. On bad days, he stays in his room and in bed. Even on good days, he stays home. He avoids driving because he is quick to anger and has engaged in road rage incidents. His mother drives him to his medical appointments and to the grocery store, and he only goes to the grocery store late at night so he can avoid other people. Even then, he has had verbal altercations with other customers. He limits his associations with others to his mother and stepdad. And in his first social public appearance since quitting alcohol and drugs, Mr. Carr told his psychiatrist he had to take a Xanax to get through it.

The ALJ's subjective symptom analysis focused on evidence of improvement in Mr. Carr's symptoms due to medication. For instance, the ALJ noted that Mr. Carr told his psychiatrist that his medication "helped him stop and think before reacting and that he was not as explosive anymore, although he still tried to avoid others as much as possible." (Tr. 21). In the same vein, the ALJ addressed Mr. Carr's reported symptoms of high anxiety in public places, irritability, panic attacks, mania, and depression; the ALJ determined that after Mr. Carr added lithium to his prescription regimen, his "reported irritability concentration, racing thoughts, distractibility, and

24

argumentativeness were all improving." (Tr. 22). Additionally, the ALJ noted that Mr. Carr reported limited outbursts and an ability to remove himself from a situation. (*Id.*).

Outside of improvement, the ALJ considered Mr. Carr's trip to West Virginia and the single time Mr. Carr went to a restaurant with friends. The ALJ did not consider Mr. Carr's very limited daily activities, or the measures Mr. Carr uses to avoid exacerbating or triggering his anxiety and anger. The ALJ's failure to address the factors relevant to the subjective symptom evaluation is error.

For these reasons, I recommend the Court remand this case for re-evaluation of the subjective symptom analysis that complies with the principles and standards described in this Report and Recommendation.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: March 29, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R.**

Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).